IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STEPHEN MCKERROW | * | |
| | * | |
| v. | * | Civil Case No. CCB-14-2865 |
| | * | |
| BUYERS PRODUCTS COMPANY | * | |

******

**MEMORANDUM**

Defendant Buyers Products Company ("BPC") filed a motion to exclude the testimony of Michael Leshner ("Leshner"), the expert witness retained by Plaintiff Stephen McKerrow ("McKerrow") in this products liability case. (ECF No. 15). In the same motion, BPC also seeks summary judgment as to all claims. *Id.* The issues in this case have been fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, BPC's motion to exclude the testimony of the expert witness and for summary judgment will be granted. Plaintiff's motion for leave to file a second designation of expert witnesses, (ECF No. 13), which seeks to designate the medical examiner retained by the defense as the plaintiff's own expert, will be denied as moot.

**BACKGROUND**

The facts viewed in the light most favorable to McKerrow, the non-moving party, are as follows. McKerrow owns and operates an estate sale business, and tows trailers in the course of that business. (McKerrow Dep., Pl.'s Opp. Ex. 1 at 8:1, 10:1, 11-17, ECF No. 19-2). On January 5, 2012, McKerrow purchased a swing-away trailer jack from Centreville Manufacturing, a store that sells trailer accessories. (*Id.* at 17:21-18:3). The jack was marked with BPC's name and a BPC model number, though BPC did not manufacture or design the jack. Rather, BPC purchased the jack, fully designed and manufactured, from a vendor in China, and then labeled the jack

with its own trade name for sale. (Def.'s Answers to Pl.'s Interrogatories, Pl.'s Opp. Ex. 2 at 6-7, ECF No. 19-3). The purpose of the BPC jack is to support the weight of the trailer, while a pivoting wheel on the bottom of the jack allows users to move the trailer and to align the tongue of the trailer with the ball hitch on the towing vehicle. (Pl.'s Opp. 5, ECF No. 19-1). McKerrow selected the BPC jack for its ease of use. (McKerrow Dep., Pl.'s Opp. Ex. 1 at 20:8-12). The parties concur that McKerrow installed and operated the jack correctly. (Def.'s Mot. Summ. J. 2, ECF No. 15-1).

On approximately April 25, 2012, McKerrow disconnected the trailer from his vehicle and parked it on the curb in front of his home. (Pl.'s Opp. 5). The jack's pin remained engaged. (McKerrow Dep., Pl.'s Opp. Ex. 1 at 73:2-5, 13-18). On April 29, 2012, McKerrow attempted to hitch the trailer to his vehicle. He first began to crank the BPC jack up, and backed his vehicle down toward the trailer to "do the hitch process." (McKerrow Dep., Def.'s Mot. Summ. J. Ex. A at 74:3-7, ECF No. 15-2). According to McKerrow, when he backed his vehicle up, he "got out of the car and looked and [he] probably saw that [he] was in the correct—more or less the correct position [to hitch the trailer to the vehicle] . . . [that he] might have been off an inch or two . . . but that was [his] goal because [he] had the wheel jack [so he] make the final adjustment by nudging the trailer back and forth." (*Id.* at 74:14-22). He noticed that the tongue of the trailer was "slightly off to the left" of the ball hitch, which was "not at all uncommon," such that he was "going to have to move it slightly." (*Id.* at 75:6-15). McKerrow "gave the trailer a little nudge with [his] knee, expecting it to move slightly like this so it would pop." (*Id.* at 79:11-12). The jack collapsed and the tongue of the trailer "slammed down" on McKerrow's hand, injuring him. (*Id.* at 79:13-22, 81:1-82:2).

This action ensued. McKerrow retained Leshner, who is a mechanical engineer, to opine as to the cause of the accident and to the alleged defects in the BPC jack. BPC seeks to exclude Leshner's testimony. BPC further argues that because Leshner's testimony is inadmissible, summary judgment is appropriate for McKerrow's claims.

## ANALYSIS

**A. BPC's Motion to Exclude Leshner's Testimony**

McKerrow alleges claims against BPC for defects in both design and manufacturing of the jack, and for failure to warn. (Compl. ¶¶ 4-7, 10, 12, ECF No. 1). It is unclear from his Complaint whether he pursues these claims through a theory of strict liability, a theory of negligence, or both. To prevail on his manufacturing defect claim, McKerrow must "offer evidence of some indication" that the jack "either was not manufactured in accordance with" the manufacturer's design specifications, or that, during the manufacturing process, the jack was "assembled improperly or that some other error occurred." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 411 (D. Md. 2001). As to design defect, he must show "(1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a causal relation between the defect and the injury." *Wood v. Toyota Motor Corp.*, 134 Md. App. 512, 517, 760 A.2d 315, 318 (2000). Similarly, McKerrow's failure to warn claim requires a showing that the condition in the BPC jack that caused his injury was a latent defect not readily apparent to consumers, which BPC knew or should have known could be a substantial factor in causing injury during a reasonably foreseeable use. *See Nicholson v. Yamaha Motor Co., Ltd.*, 80 Md. App. 695, 721, 566 A.2d 135, 148 (1989).

All three of McKerrow's claims must be supported by admissible expert testimony because they involve subject matter that is "beyond the ken of the average layman." *Wood*, 134

Md. App. at 518, 760 A.2d at 319 (2000) (quoting *Hartford Acc. & Indem. Co. v. Scarlett Harbor Associates Ltd. P'ship*, 109 Md. App. 217, 257, 674 A.2d 106, 126 (1996), *aff'd.* 346 Md. 122, 692 A.2d 153 (1997)) (citations omitted). In specific support of McKerrow's claims, Leshner opines that BPC's product, when side-loaded, suffers from a "false-lock condition" and has poor spring force, poor surface finish, and too wide a groove in its snap ring (which, according to Leshner, is a form of retaining ring, *see* (Leshner Dep. 1, Def.'s Mot. Summ. J. Ex. C at 131:11, ECF No. 15-4))[1], which allows "excessive motion between the jack and mounting plate." *See* (Leshner Report, Pl.'s Opp. Ex. 5 at 14, 20-21, ECF No. 19-6). Those issues are not within the scope of most jurors' knowledge. Because the claims involve highly technical inferences, McKerrow is required to introduce testimony from an expert well-versed in the issues before the Court.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587-88 (1993). In determining whether expert testimony is admissible, the court must consider the following four factors: (1) whether the method upon which the expert relied is based on a testable hypothesis; (2) the known or potential rate of error associated with the method; (3) whether the method has been subject to peer review; and (4) whether the expert's method of testing is accepted within the relevant scientific community. *Id.* at 593-95. The party seeking to introduce an expert's opinions bears a burden of establishing, by a preponderance of the evidence, that these "pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee notes (2000) (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). A trial judge, acting as gatekeeper, must keep in mind two sometimes competing principles when deciding

---

[1] Leshner was deposed twice during the course of the litigation: first on March 13, 2015, and subsequently on March 20, 2015. *See* (Def.'s Mot. Summ. J. Ex. C). I will refer to Leshner's March 13, 2015 deposition as "Leshner Dep. 1" and his March 20, 2015 deposition as "Leshner Dep. 2."

whether to admit an expert's conclusions. First, Rule 702 was intended to liberalize the introduction of relevant expert testimony and thus encourages courts to rely on vigorous cross-examination and presentation of contrary evidence to counterbalance expert opinions of uncertain veracity. *See Daubert*, 509 U.S. at 588, 596; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Simultaneously, however, a trial court must mind the high potential for expert opinions to mislead, rather than enlighten, a jury. *Westberry,* 178 F.3d at 261.

Under Rule 702, to be "qualified" as an expert, a witness must have "knowledge, skill, experience, training, or education" in the subject area in which he intends to testify. Fed. R. Evid. 702. An expert's qualification depends on "the nature of the opinion he offers." *See Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984). While an expert's specialized knowledge and experience need not align perfectly with the issues before the court, an expert's opinion is admissible under Rule 702 "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Shreve*, 166 F. Supp. 2d at 392-93 (citations and internal quotation marks omitted). The Court will assume without deciding that Leshner, as a mechanical engineer, is qualified to testify about the subject of trailer jacks, despite the fact that he has no specific experience with the product. *See* (Leshner C.V., Pl.'s Opp. Ex. 3, ECF No. 19-4; Leshner Dep. 1, Def.'s Mot. Summ. J. Ex. C at 63:4-8).

Even where an expert is qualified to provide an opinion on a particular subject, however, his testimony is not admissible if its underlying methodology does not satisfy Rule 702. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 153 (1999) (upholding the trial court's finding that the expert's qualifications were sufficient, but his methodology was unreliable).

Moreover, "[t]he inquiry underlying the *Daubert* factors involves not only whether the methodology that the expert used is generally accepted within the relevant scientific or professional community, but also whether it was reasonable for the expert to use that methodology to draw a conclusion regarding the particular matter to which the expert testimony is directly relevant." *Shreve*, 166 F. Supp. 2d at 395 (citing *Kumho Tire Co.*, 526 U.S. at 154). Courts interpret Rule 702 as requiring trial judges to only admit expert testimony where the underlying methodology satisfies a two-prong test for (1) reliability and (2) relevance. *See Daubert*, 509 U.S. at 589; *Adams v. NVR Homes, Inc.*, 141 F. Supp. 2d 554, 565 (D. Md. 2001). "A reliable expert opinion must be based on scientific, technical or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis omitted). In the instant case, BPC challenges the first prong—the reliability—of the proffered expert testimony.

To satisfy Rule 702's "reliability" prong, expert testimony "must be supported by appropriate validation." *Daubert*, 509 U.S. at 590; *Kumho Tire Co.*, 526 U.S. at 149. A court will not "credit an expert witness who 'testified to no customs of the trade, referred to no literature in the field, and did not identify [relevant principles],' but merely gave 'his own subjective opinion.'" *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cir. 1997) (quoting *Alevromagiros v. Hechinger*, 993 F.2d 417, 421 (4th Cir. 1993)). Although the four *Daubert* factors guide a court's reliability determination, the reliability analysis is a flexible inquiry tailored to the specific facts and opinions before the court. *See Kumho Tire Co.*, 526 U.S. at 142 ("[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.") (emphasis in original); *Oglesby*, 190

F.3d at 250 ("Reliability of specialized knowledge and methods for applying it . . . may be indicated by testing, peer review, evaluation of rates of error, and general acceptability. But at bottom, the court's evaluation is always a flexible one . . .") (citations omitted).

Here, Leshner's testing methods lack any objective, independent validation. In his report, Leshner bases his findings that the BPC jack is defective on the following: (1) his inspection of McKerrow's trailer, jack, and tow vehicle, and observation of "significant looseness" between the jack frame and mounting plate, which was present when the tongue weight was "biased to the right side"; (2) a comparison between an exemplar BPC jack with the same model number as McKerrow's jack, which Leshner purchased for testing, and one other jack ("the Fulton jack"), which Leshner alleges is "rated for the same purpose and load, and [is] of very similar design" as the BPC jack; (3) a chart listing the dimensions of retaining rings manufactured by Waldes Truarc, a company that is not shown to have manufactured the retaining rings used in either the BPC jack or the Fulton jack; (4) observations that the exemplar BPC jack's retaining ring surface is rougher than the Fulton jack's, and had therefore not been sufficiently "de-burred"; (5) a Wikipedia entry defining burring; and (6) a comparison of measurements of the pull force of the exemplar BPC jack and the Fulton jack, and the "play" of the BPC jack. (Leshner Report, Pl.'s Opp. Ex. 5 at 3-20). Leshner places the Waldes Truarc chart and the Wikipedia definition of 'burring' in a section of his report titled "Industry Standards," and opines in his report's "Analysis" section that "[i]f the Buyers jack had been designed and manufactured according to industry standards    . . . this accident would not have occurred." (*Id.* at 21). However, in his deposition testimony, Leshner notes that he is "not aware of any" published standards for swing-away jacks or products like them. *See* (Leshner Dep. 1, Def.'s Mot. Ex. C at 6:20-22). In fact, McKerrow concedes, in his opposition to the motion to exclude expert testimony, that "[i]t is

undisputed no industry standards exist . . . for swing-away style jacks." (Pl.'s Opp. 11). Leshner provides no contrasting evidence to suggest that the Fulton jack is any more representative of industry standards than the BPC jack, or that retaining rings from Waldes Truarc somehow represent industry standards, as opposed to the dimensions used by a single manufacturer.

Leshner's theory of the defect in the BPC jack is that it is subject to a "false locking condition" during use, where the jack's locking pin gets stuck on the side of the clearance hole such that the pin—and, therefore, the jack—is not properly locked in place. (Leshner Dep. 1, Def.'s Mot. Summ. J. Ex. C. at 166:8-13; Leshner Report, Pl.'s Opp. Ex. 5 at 21). The false locking condition has the potential to cause injury when the trailer tongue weight is "shifted from left to right" because the jack "rocks on the mounting plate, opening a gap . . . and can pull the locking pin right out of its partial engagement," which can lead to the collapse of the jack. (Leshner Report, Pl.'s Opp. Ex. 5 at 20). Leshner concluded in his report that McKerrow's accident was "caused by the failure of the trailer jack," that "the jack's locking pin does not lock reliably," and that "poor locking reliability is caused by design and manufacturing defects." (*Id.* at 21). According to Leshner, the jack's false locking condition is due to the jack's "tapered hole," the "rough surface" of the jack's hole, and the jack's "inadequate spring." (Leshner Dep. 1, Def.'s Mot. Summ. J. Ex. C. at 166:2-8).

However, during his testing, Leshner neither measured the "pull force" and clearance hole on McKerrow's BPC jack to verify the jack's false locking condition, nor replicated the conditions under which McKerrow used the BPC jack immediately prior to his injury. (Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 252:18-22, 288:6-8, 14-16, ECF No. 15-4). Specifically, Leshner stated that there was "little to no weight" resting on the jack when he placed it in the false-lock condition, and that he "[did not] believe [he] applied the full weight on the jack while

it was in the false-lock condition." (Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 211:10-21). McKerrow testified during his deposition, however, that the jack bore the full weight of the trailer when the incident occurred. *See* (McKerrow Dep., Def.'s Mot. Summ. J. Ex. A at 73:13-74:2).

Moreover, McKerrow testified that each time he uses the jack, he always ensures that he hears the sound of the spring-loaded locking pin "clicking" into place, which signifies that the pin is fully engaged, before use. (McKerrow Dep., Def.'s Mot. Summ. J. Ex. A at 48:1-49:5). Leshner could not demonstrate, and could not point to his report to verify, that the sound of the spring-loaded locking pin "clicking" into place also occurs when the jack enters the false-lock condition. *See* (Leshner Dep. 1, Pl.'s Opp. Ex. 4 at 185:19-187:17, ECF No. 19-5; Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 257:14-258:14). Further, there is no evidence that Leshner attempted to test the Fulton jack to see whether it would be subject to the same false-lock condition, *see* (Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 273:2-274:2), though the expert retained by BPC testified that, in fact, the Fulton jack could be similarly manipulated to have the same problem. (Bress Dep., Pl.'s Opp. Ex. 8 at 62:14-22, ECF No. 19-9).

Leshner states in his deposition that the conclusions contained in his report are not based on a comparison between the BPC jack and the Fulton jack, but, rather, are based on "his inspection," which enabled him to "determine that the [BPC] jack is defective because of its looseness, because of its poor surface finish, and an inadequate spring force." (Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 274:3-17). Leshner explains that he "got the Fulton jack just to support that opinion by showing that some other jack had double the spring force, a much smoother surface finish, and was not too loose," and that the purpose of using the Fulton jack for comparison was that "it would be more persuasive to show a proper product and compare them."

(*Id.* at 274:18-21, 276:1-5). Yet, for example, when asked if there is "a definition in the field of . . . mechanical engineering that constitutes significant looseness," Leshner replied that he was "not aware of any published definition of significant looseness," and noted that there was no industry standard he could name to identify when looseness is "significant," as he could "only compare something that's not loose against something that is loose." (*Id.* at 270:12-21). Upon counsel for BPC remarking that he, counsel, would be able to do the same looseness comparison, Leshner replied, "Anyone can do that [looseness comparison]." (*Id.* at 270:22, 271:1).

Leshner never specifies why he chose the Fulton jack for comparison as opposed to another swing-away jack with the same design and load rate as the BPC jack, why he purchased an exemplar model BPC jack instead of testing McKerrow's jack, which McKerrow continues to use, against the Fulton jack, *see* (McKerrow Dep., Def.'s Mot. Summ. J. Ex. A at 99:8-20), or why he examined the exemplar BPC jack against only one other jack. He states in his report that "[i]n the Fulton design, [the] edges of holes" in the Fulton jack's mounting plate "have been properly de-burred," and, comparing the two jacks, concludes that "[i]n the [exemplar BPC] jack, the rough surface in and around holes in the mounting plate result from the manufacturing process," implying that, since it is "customary in the industry to de-burr punched holes in steel plates, to remove any sharp edges and smooth irregularities in the surface," the BPC jack's mounting plate was not properly de-burred. (Leshner Report, Pl.'s Opp. Ex. 5 at 19-20). Leshner then observes that the "surface finish" in the exemplar BPC jack is poor, which he assumes "contributes to intermittent failure of the locking pin to fully engage." (*Id.* at 20.)

Yet again, however, Leshner fails to explain the basis or methodology for his conclusions that the BPC jack's "irregular inner surface can introduce excessive friction against the side of the locking pin and interfere with proper pin engagement" and that the "tapering down of the

hole diameter" on the BPC jack "contributes to preventing the pin from becoming fully engaged into the hole." (Leshner Report, Pl.'s Opp. Ex. 5 at 17, 18). He admits that he did not examine the burring or tapering on McKerrow's jack, specifically, and only examined any irregularities on the exemplar BPC jack he ordered, justifying his action by stating that McKerrow's jack and the exemplar BPC jack are "manufactured on the same equipment. . . . The fact that the hole is a tapered hole would be the same on every single [BPC] jack, because they're punched and manufactured on the same machine." (Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 343:16-344:3, 344:9-13). In the same line of questioning, however, Leshner states that all BPC jacks manufactured in the same time frame as the exemplar BPC jack he purchased "should . . . have a poor surface finish," and admits that he purchased the exemplar jack "two years after [McKerrow] bought [the jack]," and that he did not know when his exemplar jack and McKerrow's jack had each been manufactured. (*Id.* at 344:14-345:12). His basis for his opinion that both jacks were manufactured on the same punch press was merely that he "know[s] how parts are manufactured." (*Id.* at 345:13-22).

Further, in the section of his report titled "Industry Standards," Leshner compares the specifications of the BPC and Fulton retaining rings to those of another company, Waldes Truarc, using a chart he obtained from the Waldes Truarc catalog listing that company's retaining ring dimensions. (Leshner Report, Pl.'s Opp. Ex. 5 at 19). He states in his report that "snap rings and their corresponding groove dimensions are standardized in the industry," *see* (*id.* at 19), and testified in his deposition that Waldes Truarc is the "dominant manufacturer" of snap rings. (Leshner Dep. 1, Def.'s Mot. Summ. J. Ex. C at 127:2-8). Leshner cites the Waldes Truarc chart as proof of such standardization without identifying why, beyond his anecdotal observations that at "[e]very company that [he has] worked in in the last 40 years up until the

Internet, engineers had a bookshelf of catalogs. . . . If they were designing a snap ring, they would pull the Waldes snap-ring catalog because that's the dominant manufacturer in the U.S.," and that the Waldes is the manufacturer he is "most familiar with." (Leshner Dep. 1, Pl.'s Opp. Ex. 4 at 126:15-127:13).

Moreover, Leshner's citation to the Waldes Truarc chart to show the "industry standard" for retaining rings, and his conclusion that "if the [BPC] jack had been designed and manufactured according to industry standards, its locking mechanism would have been reliable, and this accident would not have occurred," is not entirely consistent with his sworn testimony that there are no published industry standards for swing-away jacks like those manufactured by BPC or the components thereof that he claims are faulty, that "all other manufacturers of retaining rings," in addition to Waldes Truarc, also "set[] the industry standard [of retaining rings]," and that he is unaware of "any professional organization, governmental agency, anything that provide[] any standards for manufacturers for retaining rings." (Leshner Dep. 1 and 2, Pl.'s Opp. Ex. 4 at 126:6-21, 145:8-11, 323:14-324:22; Leshner Dep. 1 and 2, Def.'s Mot. Summ. J. Ex. C at 6:17-22, 127:19-22, 212:8-12, 291:2-15).[2] Additionally noteworthy is the inconsistency between Leshner's assertion that the BPC jack's groove is "much too wide, accounting for looseness in the assembly" and that the Fulton jack, rather, is a "good design," and his acknowledgment during his deposition that the Fulton jack does not comply with the Waldes Truarc specifications and misses those specifications by seven thousandths of an inch. (Leshner Report, Pl.'s Opp. Ex. 5 at 19; Leshner Dep. 2, Def.'s Mot. Summ. J. Ex. C at 314:2-315:12).

It is insufficient to identify only one other competing product, note that that product is different, and conclude, without any scientific methodology or basis, that the second product is

---

[2] Leshner did explain that, in his opinion, when there are no published standards, "you look to industry standards for the components, and you look to similar products." (Leshner Dep. 1, Def.'s Mot. Summ. J. Ex. C at 7:1-4).

superior and the first product is therefore defective. Engineering, in particular, is "a field of applied science" that "relies on scientific method." *Shreve*, 166 F. Supp. 2d at 398 (citing *Kumho Tire Co.*, 526 U.S. at 148). "That method involves formulating a hypothesis to explain the world based upon what is already known and then subjecting the hypothesis to tests designed to falsify (or confirm) the hypothesis." *Id.* (citing *Daubert*, 509 U.S. at 590). Here, by contrast, Leshner's opinion is subjective, since he "posit[s] a seemingly plausible mechanical defect that is grounded in . . . unexamined assumptions (*e.g.*, no human error contributed to the incident) to explain [the plaintiff's] accident, after refusing to consider any other possible explanations, [and] conclude[s] that his hypothetical cause was 'more likely than not' true without any attempt to verify or falsify it." *Id.* at 398-99. In accepting an opinion as "expert," the Court requires more. *See, e.g.*, *Freeman*, 118 F.3d at 1016 (finding that the design defect expert's testimony was sufficient to support the jury verdict, and noting that the expert "did not simply opine on the basis of 'his own subjective opinion.' Rather, he applied his experience and training in tractor design in reviewing numerous published materials, including papers by the Society of Agricultural Engineers, extensive industry literature, various tractor specifications, and trade journals before reaching his conclusions.").

Because Leshner's investigation lacked proper methodology and independent verification of his hypothesis, his opinions as to whether McKerrow's BPC jack was defective in either manufacturing or design, or both, will be excluded. Likewise, because he cannot opine as to whether a defect exists and was the cause of McKerrow's accident, his opinion as to whether BPC had a duty to warn consumers of a latent defect in the jack McKerrow purchased must also be excluded.

### B. BPC's Motion for Summary Judgment

BPC argues that summary judgment is appropriate because, without expert testimony to support McKerrow's claims that the jack was defective, there can be no dispute as to BPC's liability. BPC is correct. Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As noted above, McKerrow's design and manufacturing defect claims require competent expert testimony. *See Wood*, 134 Md. App. at 517-18, 760 A.2d at 318; *Free v. Bondo-Mar-Hyde Corp.*, 25 F. App'x 170, 173 (4th Cir. 2002) ("Without the expert's testimony, Plaintiffs cannot carry their burden of proof. Therefore, summary judgment in favor of the Defendants was properly granted.").[3] Similarly, because issues in this case are too technical for a layman to draw conclusions, an expert is required to establish that the BPC jack was defective, and, thus, that BPC had a duty to warn McKerrow about its use. Accordingly, because Leshner's testimony will be excluded, BPC is entitled to summary judgment as a matter of law on all of McKerrow's claims.

### C. McKerrow's Motion for Leave to File Second Designation of Expert Witnesses is Denied as Moot

McKerrow seeks leave from the Court to designate Dr. Nelson Goldberg, the damages expert retained by BPC in this case, as his own damages expert to opine about McKerrow's

---

[3] Unpublished opinions are cited not as precedent but for the persuasiveness of their reasoning.

injuries. *See* (Pl.'s Mot. ¶ 3-5, ECF No. 13). Given that BPC's motion for summary judgment will be granted, McKerrow's motion for leave to file a second designation of expert witness will be denied as moot.[4]

## CONCLUSION

For the foregoing reasons, BPC's motion to exclude expert testimony and for summary judgment, (ECF No. 15), will be granted. McKerrow's motion for leave to file second designation of expert witnesses, (ECF No. 13), will be denied as moot. A separate Order follows.

Dated:  March 22, 2016                                    /S/
                                                    Catherine C. Blake
                                                    United States District Judge

---

[4] Even if the motion for leave to file a second designation of expert witnesses were resolved in McKerrow's favor, it would not provide the expert testimony required to sustain his claims, as Dr. Goldberg would only opine as to damages, not as to the existence of a defect in the jack.